(78 Misc. Rep. 311.)

#### POEL et al. v. BRUNSWICK–BALKE–COLLENDER CO.

(Supreme Court, Trial Term, New York County. November, 1912.)

1. SALES (§ 23*)—CONTRACT—MEETING OF MINDS.

Plaintiffs' agent, having had a certain conversation with defendant's representative as to the purchase of rubber to be shipped in installments between January and June, 1911, wrote defendant, acknowledging receipt of a telephone offer to purchase 12 tons up-river fine Para rubber, at $2.42 per pound, to be shipped from Brazil or Liverpool in equal monthly parts January–June, 1911, and agreeing to accept or reject the following Monday. On that day plaintiffs again wrote defendant, inclosing a sold note reciting a sale to defendant, for equal monthly shipments January–June, 1911, from Brazil or Liverpool, about 12 tons fine up-river Para rubber, at $2.42 per pound, payable in United States gold or its equivalent 20 days from date of delivery. Defendant, on receiving this letter, returned to plaintiffs an executed order blank, requesting plaintiffs to deliver the rubber on the same terms as specified in the sold note, but requesting prompt acceptance. Plaintiffs, believing that the contract was complete, did not reply. *Held*, that such facts showed a sufficient meeting of minds to constitute a valid contract of sale.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 44–48; Dec. Dig. § 23.*

For other definitions, see Words and Phrases, vol. 7, pp. 6291–6306; vol. 8, p. 7793.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. FRAUDS, STATUTE OF (§ 125*)—SALE OF GOODS—ORAL CONTRACT.

The statute of frauds does not declare an oral contract for the sale of goods to be invalid, but only requires that, to be valid, there must be a note or memorandum thereof.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 275–277½; Dec. Dig. § 125.*]

3. FRAUDS, STATUTE OF (§ 118*)—SALE OF GOODS—"MEMORANDUM"—REQUISITES.

A note or "memorandum" of a sale of goods, to satisfy the statute of frauds, need not be confined to a single paper, but may rest in letters, telegrams, bills, receipts, or other forms of signed writings which sufficiently evidence the contract of the parties.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 262–265; Dec. Dig. § 118.*]

For other definitions, see Words and Phrases, vol. 5, pp. 4472–4473; vol. 8, p. 7720.]

4. FRAUDS, STATUTE OF (§ 118*)—SALE OF GOODS—MEMORANDUM.

Plaintiffs, having received a telephone from defendant's agent as to the purchase of rubber for future delivery, confirmed the receipt of the offer by letter, setting an early date to accept or reject. On that date plaintiffs inclosed a sold note to defendant, reciting that plaintiffs had sold for shipment, as specified, about 12 tons up-river fine Para rubber at a price stated, and naming terms of payment and delivery. In reply defendant sent plaintiffs a written order for the rubber, made out on one of defendant's order blanks, to which plaintiffs did not reply, and nothing further was done for eight months, when defendant denied liability, on the ground that its agent had no authority to make the contract. Held, that the writings constituted a sufficient memorandum of the contract to satisfy the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 262–265; Dec. Dig. § 118.*]

Action by Frans Poel and Charles H. Arnold, copartners, against the Brunswick-Balke-Collender Company. Judgment for plaintiffs on certain preliminary issues.

Pinney, Thayer & Van Slyke, of New York City, for plaintiffs.

Guggenheimer, Untermyer & Marshall, of New York City, for defendant.

McCALL, J. In this mattter the contention of the plaintiffs is that on or about the 4th day of April, 1910, they entered into a contract with the defendant to sell and deliver to it, under conditions and terms specified, "about 12 tons of 2,240 pounds each of up-river fine Para rubber," and that in January, 1911, prior to the expiration of the time agreed upon for delivery of any of the merchandise, the defendant notified the plaintiffs, in writing, that it would not accept or pay for same, or carry out any of the terms of the alleged agreement. After the issue was joined, there being in the judgment of the litigants some issues which upon the hearing or trial thereof might prove decisive of the entire controversy, an application for an order of severance was applied for and resulted in a direction of the court, under which proof was to be taken preliminarily and a decision had thereon to ascertain whether in the disposition of same it would or would not be necessary to enter into a trial of the entire controversy. The proof thereon was

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

limited to such a character as would bear on these two primary issues, viz.: First. Did the plaintiffs and defendant make the contract alleged in the complaint; that is, was there a meeting of minds? Second. Is there a written memorandum of such a contract, signed by or on behalf of the defendant, sufficient to satisfy the requirements of the statute of frauds? In disposing of these two questions the court proceeds (upon the assent of both parties) upon the assumption of the fact that Rogers had the authority and capacity to act for and bind the defendant, which assumption is merely taken to permit a disposition of these questions, and is not to be regarded as a decision upon that feature of the litigation, and with the distinct understanding upon the part of all that that is an issue yet undecided and upon which proof is to be taken, if necessity requires it.

[1] The facts established show that on April 2, 1910, which fell on a Saturday, Mr. Kelly, representing the plaintiffs, and Mr. Rogers, representing the defendant, had a telephonic communication one with the other, the subject of which was the sale and purchase of rubber of a quality or grade known as up-river fine Para rubber, and after some inquiries as to market price, etc., by Rogers and the quantity plaintiffs had for sale by Kelly, Rogers asked Kelly what he (Kelly) could do for next year—next year delivery—and Kelly replied that he could get him rubber for January–June equal monthly shipments for up-river fine Para rubber at probably $2.42 per pound, delivery to be either from Brazil or Europe. Rogers then asked Kelly if he could get him this rubber at once, and Kelly said:

"No; except until I receive my cables on Monday morning."

This conference or talk may now be stated (as explanation showed that the principal markets for this product are London, Brazil, Hamburg, and New York City, and the market prices are determined on cable communications with these different places) to have had reference to market prices. Rogers then said to Kelly:

"I will take 12 tons of up-river fine Para rubber for equal monthly shipments from Brazil or Europe at $2.42 per pound."

And Kelly was to let him know on Monday morning. On April 2, 1910, the same day Kelly and Rogers had their telephone communication, the plaintiffs wrote the following letter to the defendant:

"New York, April 2, 1910.
"Brunswick-Balke-Collender Co., Long Island City, L. I.—Gentlemen: As per telephonic communication with your Mr. Rogers to-day this is to confirm having your offer of $2.42 per pound for. twelve tons up-river fine Para rubber for shipment either from Brazil or Liverpool in equal monthly parts January–June, 1911, about which we will let you know upon our receipt of our cable reply on Monday morning. Thanking you for the offer, we remain,
"Yours very truly,                    Poel & Arnold,
                                      "Per W. J. Kelly."

On April 4th, which was on the Monday referred to in the above letter, it is conceded that the plaintiffs forwarded to, and there was received by, the defendant the following letter:

"New York, April 4, 1910.

"Brunswick-Balke-Collender Co., Long Island City, L. I.—Gentlemen: Enclosed we beg to hand you contract for twelve tons of up-river fine Para rubber as sold you to-day with our thanks for the order.

"Very truly yours,                                    Poel & Arnold,
                                                  "Per W. J. Kelly."

It is further undisputed that there was an inclosure in above letter, but the original could not be produced; the defendant asserting that it had been returned to the plaintiffs, and the plaintiffs claiming that they had never received it, and, the proper foundation being laid, the court took secondary proof in the shape of a copy, and it, as offered and accepted, reads as follows:

"April 4/10.

"Brunswick-Balke-Collender Co., Long Island City, L. I.—Sold to you for equal monthly shipments January–June, 1911, from Brazil and or Liverpool about twelve (12) tons up-river fine Para rubber at two dollars and forty-two cents ($2.42) per pound payable in U. S. gold or its equivalent cash, twenty (20) days from date of delivery here."

On some orders covering different transactions than the one in dispute, it was shown that the plaintiffs had inserted a clause which read, "this contract contingent upon strikes, accidents or other causes beyond our control," and Rogers, in testifying, said the instrument last above set forth contained this "strike clause," not attempting to further give its phraseology. With this one exception and the addition in red ink of the numerals "Order # 25409," which was defendant's number placed on this copy, it is conceded that this instrument (copy) set forth above is substantially the same as the original instrument, which was contained in the letter of April 4, 1910, addressed by plaintiffs to the defendant. As to terms of credit contained therein, Kelly swore that he arranged that with the defendant. Upon April 7, 1910, the plaintiffs received from the defendant the following, which was sent on a form used by the defendant, part of same being printed matter and part written, that constituting printed matter being in italics:

"*Order No. 25409.*

"*(This number must appear on invoices and cases.)*
"*Purchase Dep't the Brunswick-Balke-Collender Co. of New York, Review Ave., Fox and Marsh Sts.*

"*Long Island City, 4/6 1910.*

"M Poel & Arnold, 277 Broadway, N. Y. C.: *Please deliver at once the following and send invoices with goods:*
"About 12 tons up-river fine Para rubber at 2.42 per pound.
"Equal monthly shipment January–June, 1911.
"*Conditions upon which above order is given:*
"*Goods on this order must be delivered when specified. In case you cannot comply, advise us by return mail stating earliest date of delivery you can make, and await our further orders. The acceptance of this order which in any event you must promptly acknowledge will be considered by us as a guarantee on your part of prompt delivery within the specified time.*
"Terms: ———                                    F. O. B. ———.

"*Respectfully yours,*
                "The Brunswick-Balke-Collender Co. *of New York,*
                                              "*Per* C. R. Rogers."

No other communication of any kind, written or oral, so far as I can see, passed between the parties or their representatives until January 7, 1911, upon which day the plaintiffs received from the defendant a letter, dated on that day, reading as follows, and written upon paper bearing the letter head of defendant company:

"Executive Department.

"January 7, 1911.

"Messrs. Poel & Arnold, 277 Broadway—Gentlemen: We beg herewith to advise you that within the past few weeks there has come to our attention through a statement made to us for the first time by Mr. Rogers information as to certain transactions had by him with you in the past and especially as to a transaction in April last relating to 12 tons of crude rubber. Mr. Rogers had no authority to effect any such transaction on our account nor had we any notice or knowledge of his action until he made a voluntary statement of the facts within the past few weeks. In order that you may not be put to any unnecessary inconvenience we feel bound to give you notice at the earliest opportunity after investigating the facts that we shall not recognize this transaction or any other that may have been entered into with Mr. Rogers which was without our knowledge or authority.

"Yours truly,          The Brunswick-Balke-Collender Co:

"Per Thomas P. Mills, Vice Prst."

This letter plays an important role in this litigation for two reasons, as will be seen on the subsequent reference to it. As to first question propounded, I answer "Yes;" the negotiations between the parties were all sufficient, and it is established beyond question, in my judgment, that their minds met in thorough harmony on all the features proposed. There could not be a shade of doubt about this, were it not for the attitude the witness Rogers assumed towards, and the testimony he gave affecting, defendant's Exhibit 3, called the "contract," which was inclosed in plaintiff's Exhibit 2 (letter written April 4, 1910), and which "contract" was concededly received by the defendant. Rogers said that when he sent Exhibit 4 to plaintiffs he inclosed to them Exhibit 3, and he endeavored to establish that he so returned it because he did not approve of it, and that when he forwarded Exhibit 4 with it he meant to convey to plaintiffs that he wanted it substituted in place and instead of Exhibit 3, although he admits he wrote nothing whatsoever to that effect, but merely inclosed the two Exhibits 3 and 4. It is conceded that no reply was made by plaintiffs to Exhibit 4, because, as they assert, it was already a completed transaction, and it required no reply, and that Exhibit 4 was but a mere acknowledgment that the defendant had received the "contract" upon which, as to all its terms, they had previously and absolutely agreed; and they stoutly assert that Exhibit 3 was not inclosed in the envelope that brought them Exhibit 4, and that Exhibit 3 was never, under any circumstances, returned to them. What is there to maintain Rogers' contention? He never makes a solitary inquiry after his alleged attempt to substitute Exhibit 4 for Exhibit 3 of the plaintiffs as to what their attitude would be in the premises, and it is conceded that he never heard from them. Still for a portion of the time the market price of the product was rising. He never informed his superiors, according to his testimony, even of the making of any contract, much less of his endeavor to substitute another for that submitted, which, he says, he did not approve, but from April

until the following December he stands mute as to the entire transaction, and in the latter part of that month he apprises the officers of the company of what evidently his original transaction was, and this at the time the market price of the product had fallen off over 100 per cent. and below that of the figure he had agreed upon as a purchase price. It is impossible to credit his story, either that Exhibit 3 was ever returned, or that it was his intention to make any such substitution as he asserts.   If I would want anything further to convince me in the conclusion, I would but refer to defendant's letter of January 7, 1911, wherein it is said, in repudiating Mr. Rogers' transaction of April for the purchase of 12 tons of rubber from the plaintiffs, that "*after investigating the facts* we shall not recognize," etc.   In what way could such an investigation be made excepting by interrogating Rogers, and, if he had sent this Exhibit 3 back or attempted the substitution he says he did, would not that very salient feature have been recited and set forth in the communication of January 7, 1911?   Yet *it is absolutely* silent on that score.   Exhibit 4, in my opinion, was just what the plaintiffs' attorney says it was—a hurriedly prepared acknowledgment of the receipt of Exhibit 3, as evidenced by all the earmarks of lack of care.   The printed matter calling for delivery *at once* is thoroughly inconsistent with what the understood arrangements were that delivery was to be made January–June 1911, etc., as shown in actual writing on same exhibit.   The same reasoning would apply to all these printed requirements appearing upon this Exhibit 4.   Rogers just wrote upon this form of defendant his acknowledgment of the receipt of the contract, signed by the plaintiffs, and as to which their minds had fully and completely met; and it was never the intention that this printed matter had any bearing whatsoever upon the transaction.   It conveys to plaintiffs defendant's order number and the advice that same should appear on invoices and cases.

[2, 3] Our statute of frauds does not declare an oral contract for the sale of goods to be invalid, but requires merely that, to be valid, there must be a "note or memorandum," etc., of said contract; and it is quite settled, I take it, that the written evidence required by the statute need not be confined to a single paper, but that letters, telegrams, bills, receipts, or other forms of signed writings which sufficiently evidence the contract of the parties are all that is required.   Thus Wigmore in his work on Evidence, in pointing out the distinction as between statutes *which require a contract to be in writing* and those requiring a "note or memorandum" in writing, etc., says, in reference to the latter:

"In other words, the writing is not the contract, but is distinct from it, and is merely the parties' admission that such a contract was made. * * * For example, the written admission may be subsequent to the contract. *It may even be an attempt to repudiate the contract.* It may be in a letter to a third person."

And in Browne on Statute of Frauds it is said:

"An oral contract may be taken out of the statute of frauds by letters which admit the making of the contract by the writer, but in terms repudiate his liability." Section 354a.

[4] In this aspect it will be seen, then, the importance of the letter of January 7, 1911, as I referred to supra, first, as not being confirmatory of Rogers' attitude as to Exhibit 3, and, second, as to its effect when you consider the above cited authorities, because in that letter they specifically acknowledge the existence of the transaction of April 4th, which is the subject of this litigation. Taking it in all its aspects after reviewing all the writings presented on this trial, the second question must be answered as was the first, "Yes." There is a written memorandum, signed by or on behalf of the defendant, sufficient to satisfy the requirements of the statute of frauds, and direction and procedure may be taken and had accordingly.

Judgment accordingly.